IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR. NO.  02:06cr214-MEF |
| | ) | |
| DANIEL L. PLATT | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Currently pending before the Court is Defendant Daniel L. Platt's motion to suppress statements and evidence.  Upon consideration of the motion and the testimony at the evidentiary hearing, the Magistrate Judge RECOMMENDS that the motion be DENIED.

**I.    FACTS**

Based on the testimony at the hearing held on January 16, 2007, and to a preponderance of the evidence,[1] the Court finds as follows:  On February 21, 2006, Lieutenant Donald Eugene Pugh (hereinafter Lt. Pugh) of the Millbrook Police Department received a dispatch call to go to the Platts' residence in Millbrook, in response to a call concerning an attempted suicide.  Tr. at 56-57.  When the lieutenant arrived at the residence, he did not know who was the subject of the attempted suicide. Tr. at 57.  Lt. Pugh knocked on the door, and Mrs. Platt answered the door and let him

---

[1] The Court reaches findings of fact at a suppression hearing based on a preponderance of the evidence.  United States v. Beechum, 582 F.2d 898, 913 n.16 (5th Cir. 1978), citing Lego v. Twomey, 404 U.S. 477, 489 (1972).

inside. Lt. Pugh asked what was going on; she turned and pointed towards the kitchen area. Mr. Platt came out of the kitchen at that time and the lieutenant asked what was going on. Defendant responded by making a statement, that you are going to have to arrest me and prosecute me. Lt. Pugh testified that he responded to Defendant that he did not have to worry about that, and Defendant stated **"you do[ not] understand, I have been molesting my granddaughter. You[ are] going to have to arrest and prosecute me"** (hereinafter the first statement). Tr. at 58.

Lt. Pugh had no further conversations with Defendant about the incriminating statement. Upon hearing the statement he contacted dispatch to notify the on-call investigator, Corporal Johnny Russell (hereinafter Corporal Russell), who was advised of the statement by radio and upon arrival at the scene by Lt. Pugh. Tr. at 60. Corporal Russell made contact with Defendant as soon as the paramedics finished treating him. He introduced himself and told Mr. Platt that he was there in response to a statement that Mr. Platt had made to Lt. Pugh. Corporal Russell then told Defendant that he needed to advise him of his rights. Mr. Platt said he understood, and that he understood his rights. Tr. at 74. Corporal Russell indicated that at the time he advised Defendant of his rights, he did not ascertain Defendant's educational level because the officer knew Defendant was a teacher at the junior high school and had at least a bachelors degree. He stated that Mr. Platt appeared to understand what he was saying to him and that he only appeared to be somewhat excited. Tr. at 74-75. Corporal Russell said that Defendant indicated he

2

was concerned about what had happened and that his major concern was with his granddaughter. Defendant further stated: **that he wanted this to be over without her having any more trauma.** Tr. at 75. Their conversation took place at the dining room table and took no longer than two to three minutes. Tr. at 109. Corporal Russell stated that he spoke with Defendant briefly because the detective wanted to understand what Defendant meant by the word molest. In response, Mr. Platt stated that **he meant that "he had an inappropriately touched her"-- "He said that he had digitally penetrated her"** (hereinafter Defendant's second statement). Tr. at 75-76.

Corporal Russell stated that he was concerned about Defendant's medical conditions and that the paramedics advised him that Defendant needed to have stitches. Corporal Russell testified that the medics told him that the injuries did not appear to be life-threatening. Tr. at 76. The detective also testified that he was told that Defendant had taken "some pills." Tr. at 107.

In response to the question, why did the police take Defendant to Prattville Baptist Hospital, rather than the medics, Corporal Russell testified that the medics stated that Defendant did not need to be transported by an ambulance and that his injuries were not of that type. Tr. at 76. Corporal Russell testified that after Defendant's second statement, he told Mr. Platt that he was concerned with his medical condition and did not want to talk further with Defendant until he received treatment, even though Mr. Platt told the detective he wanted to talk. Id. The detective stated that Defendant did not object to the

3

police taking him to Prattville Baptist Hospital and then bringing him to the police department after his treatment to finish talking. Id. Corporal Russell was later informed that Defendant's injuries were indeed life-threatening and Defendant was kept in the hospital for about 10 days.

Corporal Russell spoke with Defendant again on March 4th, when Mr. Pratt telephoned him from the Meadhaven hospital. Mr. Platt called because he wanted to update the investigator about his medical condition. Tr. at 78. Mr. Platt was advised that Corporal Russell still needed to speak with him and that when Defendant was released from medical supervision, the detective would like for Defendant to come see him. Id. at 78-79.

Corporal Russell met with Defendant face-to-face on March 7th, when Mr. Platt arrived at the police station. Mr. Platt was immediately placed under arrest for sexual abuse in the first degree and sodomy in the first degree. Tr. at 79-80. Corporal Russell advised Defendant of his Miranda rights by reading each right to him and initialing each right as he read them. Corporal Russell then read the waiver to Defendant and had Defendant also read the waiver. The detective had Defendant initial each waiver. Tr. at 80-81. After Mr. Platt had been advised of his rights, he gave a statement in which the discussion of pornography came up. Corporal Russell asked Defendant if he viewed pornography, and Mr. Platt told the detective on the Internet. Defendant was asked whether it was adult or child pornography. Mr. Platt responded **"well, not very much**

**child"** (hereinafter Defendant's third statement). Tr. at 82. Based upon his statement and other information that the detective had learned from Mr. Platt, Corporal Russell sought a search warrant. The search warrant requested the authority to search Mr. Platt's computer for anything that could contain child pornography.

Corporal Russell indicated that when he went out to the residence to serve the search warrant, the detective advised Mr. Platt why he was there and that he had a search warrant to seize his computer. Mr. Platt indicated that the detective did not need a search warrant and that Defendant would have given it to him. Tr. at 86. At the residence, police seized Defendant's laptop computer. The computer was brought to the Millbrook Police Department where it was impounded and eventually turned over to Margaret Faulkner of the Federal Bureau of Investigation. An analysis of the computer revealed that the hard drive contained deleted images of child pornography.

Defendant also testified at the hearing. His testimony in many respects was consistent with that of the police officers. Defendant said he had tried to slit his wrists with a knife on the day in question, but that the knife was so dull that he sawed more than cut. He indicated that it was so painful that he took around 250 -- 500 milligram Tylenol and laid down. Defendant indicated that, as a result, he was dizzy, vomiting, and very lightheaded. He also stated that he had lost a significant amount of blood. Tr. at 19-20.

In regard to his mental and emotional state, Defendant stated that he was anxious and fearful, but not so much fearful as just depressed. He stated, "I could[ not]— there

5

was[ not] anything that I can (sic) focus on." Tr. at 19.

Mr. Platt testified that when his wife came home he was lying down, and she told her daughter to go next door to get their neighbor, who was a paramedic. Defendant stated that he tried to stop her because he did not think anything was that serious that she needed to panic. Tr. at 21.

Mr. Platt stated that he could not recall whether he had been advised of his rights by the officers that evening. Defendant stated that he truly did not remember, and, in fact, he did not remember much up until a week or so after he came out of Meadhaven, when his medication was corrected. Defendant recalled that he was kept in intensive care in the hospital at Prattville for a week and then transported by ambulance from intensive care to Meadhaven, where he stayed for seven to ten days. He stated that his blurry and fuzzy condition persisted during the week that he was in Prattville Baptist Hospital. Tr. at 22.

Mr. Pratt indicated that, at the time of the incident, he was 50-years old and had served 23-years in the Air Force. He was employed as a seventh grade language arts teacher and was working on his doctorate. Mr. Pratt was asked if there was anything that he could do for the Court's benefit to assign more of a definition to the state that he called fuzzy. He replied:

> I would say that I was having a mental breakdown, strictly
> based on experience in the military and having worked with
> individuals and stressful situations where they made
> incoherent decisions, stated things that later on would come
> back and say they did[ not] remember. I do[ not] know what
> the medical term for it is. I do know that I did not have the

6

> ability to decipher right from wrong, from good decisions to bad decisions, to discern.

Tr. at 25.

Defendant testified that when he first encountered Lt. Pugh, the officer did nothing to give him an indication that he was being placed under arrest. He related that he was not approached in a threatening manner; that a firearm was never drawn: and that he did not see handcuffs. Tr. at 28-30.

In regard to the conversation that he had with Lt. Pugh, Defendant stated that he knew that he was not in custody, and that when Lt. Pugh asked him what was going on, Defendant responded by giving him information concerning what he had done. Defendant agreed with the prosecutor that Lt. Pugh did not ask about anything that had been done unrelated to the attempted suicide, and that nothing that was said to him was in response to questions about other matters. Tr. at 32.

Mr. Platt testified that Corporal Russell probably advised him of his Miranda rights before he spoke to him. He agreed that Corporal Russell did not say anything threatening to him; did not hold any type of weapon; and could not recall whether he had been handcuffed. Tr. at 34-36.

Katina Platt, Defendant's daughter, also testified on his behalf. She indicated that her mom sent her over to get the neighbor upon arriving home on the evening in question. She stated that she overheard her dad telling the neighbor and her mom that he wanted to talk to her and that he talked to her outside before the arrival of the medical personnel.

She testified that her father told her to take care of her mom and that he loved her. She stated that her father appeared to have no emotion at all and did not appear to understand what was going on. She stated that his speech was slurred like he had been drinking and that he kept repeating himself over and over again. She stated that she had never seen him in that condition before. Tr. at 41-42.

## II.     DISCUSSION

After the hearing, Defendant argued that at the time the police came to Mr. Platt's house in response to the 9/11 attempted suicide call, they knew or should have known that Defendant was in a weakened state of mind and, therefore, took advantage of him when they took his statements. Accordingly, Defendant maintains that did not knowingly, voluntarily, and intelligently waive his Miranda rights, and the Court should suppress all three statements made to police and the evidence found on Defendant's computer as a fruit of the poisonous tree. The Government counter argues that Defendant's statements were not the result of law enforcement being overbearing or coercive and that, therefore, the statements were voluntary and admissible.

The Court finds Defendant is not entitled to suppression of his statements and those statements are admissible. The Court further finds that the statements were taken in the absence of any coercive police activity and that the evidence and testimony presented at the hearing suggest that Defendant had sufficient mental awareness to understand and appreciate his actions.

### A.   Defendant's First Statement

The Fifth Amendment protects persons from self incrimination. U.S. CONST. AMEND. V.[2] "But, voluntary statements—even those made without a Miranda reading–are admissible." United States v. McKenzie, 132 Fed. Appx. 788, 789 (11th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 478 (1966)); Sullivan v. State of Alabama, 666 F.2d 478, 482 (11th Cir. 1982) (citations omitted). Where the statements were unsolicited, spontaneous, and freely made prior to any attempted interrogation, the Miranda rule does not apply. Sullivan v. State of Alabama, 666 F.2d at 482 (citing United States v. Savell, 546 F.2d 43, 46 (5th Cir. 1977)). The Miranda Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 477-78.

The testimony at the hearing clearly establishes that Mr. Platt's first statement to Lt. Pugh was a voluntary, unsolicited, and spontaneous response to Lt. Pugh's inquiry

---

[2]The entire text of the Amendment provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, . . .; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. CONST. AMEND. V.

about what was going on in regard to the attempted suicide. The record establishes that Lt. Pugh did not know that a crime may have been committed when he first came to the Platt's residence and did not become aware of it until Defendant made the statement about molesting his granddaughter. Moreover, the pre-Miranda conversation between Defendant and Lt. Pugh does not reveal any of the significant restraint of freedom characteristics of a custodial interrogation. Defendant was not under arrest or handcuffed. In fact, Defendant testified at the hearing that in regard to the conversation he had with Lt. Pugh, Defendant knew that he was not in custody and that he responded to the officer's question by giving him information concerning what he had done. Lt. Pugh's initial inquiry was merely an attempt to investigate the attempted suicide call. And, the officer did not pursue questioning with Defendant, despite Mr. Platt's statement.

Although it is settled that statements or confessions made during a time of mental incompetency or insanity are involuntary, and, consequently, inadmissible, voluntariness is premised on the totality of the circumstances. Sullivan, 666 F.2d at 482-83 (citing Townsend v. Sain, 372 U.S. 293(1963); Blackburn v. United States, 361 U.S. 199, 206 (1960)). It is clear from the evidence that at the time Lt. Pugh made his inquiry about what was going on, he did not have time to assess the mental or physical condition of Defendant Platt. Lt. Pugh only had time to knock on the door, be greeted by Defendant's wife, and ask her what was going on, before Defendant volunteered his statement about molesting his granddaughter. Thus, the Court finds no support for the argument that Lt.

Pugh took advantage of Defendant simply because Defendant was depressed and suffering from the effects of ingesting too many Tylenol. The first statement is admissible.

### B.   Defendant's Second Statement[3]

To determine whether a defendant's waiver of Miranda rights was voluntary, knowing, and intelligent, the court engages in a two-part inquiry. First, the Court must determine whether the relinquishment of the right must have been voluntary in the sense that it was the product of "a free and deliberate choice rather than intimidation, coercion or deception." Colorado v. Connelly, 479 U.S. 157, 170 (1986) (citing Moran v. Burbine, 475 U.S. 412, 421 (1986)). Coercive police activity therefore is a necessary predicate to the finding that a confession was not voluntary. Colorado v. Connelly, 479 U.S. 157, 170 (1986); United States v. Thompson, 422 F.3d at 1296. Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" Id. (citing Oregon v. Elstad, 470 U.S. 298, 305 (1985)). "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995) (citing Moran v. Burbine, 475 U.S. at 421)). Thus, the Court looks to the totality of the circumstances in assessing whether police conduct was causally related to the confession. United States v.

---

[3] The Court need not reach the issue whether Defendant was in custody for purposes of the second statement, because Defendant received his Miranda warnings.

Thompson, 422 F.3d 1285, 1295 (11th Cir. 2005) (citing United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992)). "'Among the factors we must consider are the defendant's intelligence, the length of [his] detention, the nature of the interrogation, the use of any physical force against [him], or the use of any promises or inducements by police.'" United States v. Louis, 157 Fed. Appx. 165, 169 (11th Cir. 2005) (quoting Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003) cert. denied, 540 U.S. 951 (2003)).

Here, the fact that Defendant was in a weakened state of mind when he made the second statement does not, by itself, render his waiver involuntary. See United States v. Barbour, 70 F.3d 580, 585 (citing Colorado v. Connelly, 479 U.S. at 169-70)). There also must be evidence of the police taking advantage of him in this state. Nothing on the record indicates that Defendant's second statement was the product of intimidation, coercion, or deception. Before Corporal Russell talked with Defendant, the medics informed him that Defendant needed stitches and that Defendant's injuries were not life-threatening. The medics also informed Corporal Russell that Defendant's injuries were not severe enough for the ambulance to transport Defendant to the hospital. Only Corporal Russell spoke with Defendant, and Defendant was questioned in his home for a brief period of time–approximately two or three minutes. The detective then sought medical attention for Defendant. Defendant testified that Corporal Russell did not say anything threatening to him and did not hold any type of weapon in his presence.

Although Defendant could not remember, the detective indicated that he did not place Defendant in handcuffs, nor was Defendant under arrest. These facts indicate that Defendant voluntarily made his second statement. See Fare v. Michael, 442 U.S. 707, 726-27 (1979) (concluding that defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit . . . . The officers did not intimidate or threaten respondent in any way."); cf. United States v. Barbour, 70 F.3d at 585 (finding defendant's statements and consent to search voluntary despite defendant's severe depression because the police offered and provided medical assistance to defendant and treated him politely and courteously).

Defendant appears to argue that because he was in weakened state of mind and ingested a toxic amount of Tylenol, he did not knowingly and voluntarily abandon his rights. When considered as a whole, the facts do not support Defendant's contention. At the time Defendant waived his rights, Corporal Russell knew Defendant possessed at least a bachelor's degree and was a junior high school teacher; Defendant also testified that he served in the military for 23 years and was working on receiving his doctorate degree. Upon receiving his rights, Defendant did not object to talking with the detective and indicated that he understood his rights when he waived them. Defendant further indicated that his major concern was his granddaughter and that he wanted this to be over without her having any more trauma. When the detective indicated that he was concerned about Defendant's medical condition, Defendant responded that he wanted to talk. Defendant's

responses, which show concern for his granddaughter and her suffering, to the detective's questions were lucid, indicating that he understood the questions and the events occurring around him despite having ingested a toxic dosage of Tylenol. In fact, Defendant had the choice to exercise the most basic method at his disposal for avoiding talking with the detective—simply not talking. Despite his medical condition, he agreed to talk with Corporal Russell *and* chose to speak, stating "I want to get this over with."[4]

Moreover, while the detective knew Defendant "had taken some pills," Corporal Russell did not know that Defendant had ingested a toxic dosage of Tylenol until Defendant was evaluated at the hospital and, although asked about Defendant's appearance at the hearing, did not indicate that Defendant's speech was incoherent or slurried. Rather, he indicated that Defendant seemed somewhat excited for a person that attempted suicide. Defendant's daughter, however, testified that his speech was slurred and repetitive.[5] She also testified, nonetheless, that her father wanted to talk to her before the paramedics arrived, that she observed her father telling the neighbor and his wife that

---

[4]Nevertheless, the Court is bothered by Corporal Russell's actions. The officer knew Defendant had attempted to commit suicide and needed to go to the hospital. He also knew Defendant had ingested "some pills." It did not appear necessary at the time Corporal Russell pulled Mr. Platt aside, even for two or three minutes, to talk with him.

[5]The Court gives less weight to Defendant's testimony about his state of mind, because while Defendant indicated that his memory of the events on the evening in question was "blurred" or "fuzzy," he was able to recall many details of the evening. Cf. Tr. at 22-24 with Tr. at 26, 29-32 (describing the circumstances of Lt. Pugh's arrival, including the facts that no firearm was pulled; Defendant was not handcuffed; Lt. Pugh did not approach Defendant in a threatening manner; a number of police officers came to the house; Lt. Pugh did not ask Defendant whether he had committed a crime). See also Tr. at 36 (responding similarly as to Corporal Russell's action). See United States v. Castro, 723 F.2d 1527, 1533 (11th Cir. 1984).

he wanted to speak with her, and that Defendant expressed his love for her. Again, Defendant's statements to his daughter express concern. Defendant's behavior as a whole does not evidence that Defendant's weakened condition interfered with his ability to think clearly or with his understanding of the charges against him. See United States v. Estelan, 156 Fed. Appx. 185, 189 (11th Cir. 2005); United States v. Barbour, 70 F.3d at 585-86.[6] Thus, Defendant voluntarily waived his rights, and he was aware of the nature of the rights and the consequences of waiving them. The second statement is admissible.

### C. Statements at the Station

The Court finds Defendant's third statement, made at the Millbrook Police Department after Defendant's release from Meadhaven, admissible. Defendant went to the police station after his release on his own and was placed under arrest. Corporal Russell again read Defendant his Miranda rights. Defendant was given the waiver and read the card, initialing each waiver. There is no evidence that Defendant was threatened or force was used. Defendant also admits that his mental condition improved after he was

---

[6] These facts distinguish the instant case from United States v. Bernett, 495 F.2d 943, 953-54 (D.C. Cir. 1974), upon which Defendant relies for the proposition that "[w]hen evidence of mental illness, drug use, physical or psychological duress or intoxication indicates that an inculpatory statement was not understandably and volitionally made, the due process guaranties of the Fifth and Fourteenth Amendment require that the statement and its fruits be excluded from use in the criminal prosecution." Id. In Bernett, the officer testified that when he first saw defendant, Bernett was unquestionably intoxicated. Id. at 946, 953-54. Nothing on the record indicates that it was obvious to Corporal Russell or the medics that Defendant was unquestionably suffering from a toxic overdose of Tylenol while Defendant was treated by the medics or at any time during Corporal Russell's interactions with Mr. Platt on February 21, 2006.

released from Meadhaven. These facts indicate that Defendant voluntarily waived his rights. Moreover, Defendant made his statement lucidly and had normal speech patterns. See Govt's Response to Def.'s Mot. to Suppress at Exh. A. As discussed above, Defendant spent 23 years in the military and had a college degree at the time he waived his rights. These facts as a whole support the Court's conclusion that Defendant understood the nature of the rights and the consequences of waiving them. See United States v. Estelan, 156 Fed. Appx. 185, 189 (11th Cir. 2005); United States v. Barbour, 70 F.3d at 585-86.[7]

### D.   Computer Search Warrant

In a supplemental brief, Defendant argued that law enforcement's search and seizure of his computer exceeded the scope of the warrant. Defendant maintains that the search warrant permitted the government to search for "recently" deleted data, and that by definition, only recently (or at a recent time; lately; not long since) deleted files are admissible. Defendant asserts that the Government should provide the dates of deletion for all inculpatory images for the Court to determine whether the evidence is admissible. Def.'s Mot. to Suppress Supplement at 1-2.

The Court finds that law enforcement did not exceed the scope of the warrant in searching Defendant's computer. As the parties have stipulated at the hearing that it is not possible to provide each date on which a deletion occurred, Tr. at 111-13, and

---

[7]The Court observes that no evidence was provided indicating how long Defendant was questioned by police at the station.

Defendant has not provided any evidence supporting its contention that the images were not "recently" deleted, Defendant's argument fails. United States v. Taylor, 882 F.2d 1018, 1033 (6th Cir. 1989) (holding that the individual challenging that the search went beyond the scope of the warrant bears the burden of proof and persuasion); see United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998 ) (citing United States v. Eyster, 948 F.2d 1196, 1209 (11th Cir. 1991)).[8]

### III.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that Defendant's motion to suppress (Doc. #20, #36) be DENIED. It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation within a period of **13 days** from the date of mailing or transmittal to them. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the

---

[8]As discussed above, Defendant maintains that the statements and the search of his computer were fruits of the poisonous tree. For the reasons indicated above, the Court does not agree. Cf. Wong Sun v. United States, 371 U.S. 471, 488 (1963) (excluding narcotics and statements which resulted from an unlawful invasion of a defendant's bedroom).

District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982).  See Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982).  See also Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

      DONE this the 26th day of February, 2007.

    /s/ Wallace Capel, Jr._____
    WALLACE CAPEL, JR.
    UNITED STATES MAGISTRATE JUDGE